

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

**GROVER SELLERS**
**ATTORNEY GENERAL**

Honorable George H. Sheppard
Comptroller of Public Accounts
Austin, Texas

Dear Sir:

Opinion No. O-5734
Re: Authority of Comptroller,
under stated facts, to
issue warrant in payment
of Motor Fuel Tax refund
claim of Brown & Root.

We have received and considered your request for
opinion on the above matter. From such request we quote as
follows:

"Your opinion is respectfully requested up-
on several questions which have been presented
in connection with a claim for refund of motor
fuel tax filed by Brown & Root, Inc., contractors,
who constructed a defense project on Matagorda
Island in South Texas.

"Briefly stated, the facts are as follows:

"1. Brown & Root, Inc., was the contractor
engaged by the United States Government to con-
struct a defense project on Matagorda Island.

"2. Matagorda Island at the time of the
construction work had no public roads, streets
and highways, and the motor fuel involved in the
claim filed by them was used for non-highway
purposes and was, for this reason, subject to
refund of the tax paid.

"3. Brown & Root paid 12¢ per gallon for
the motor fuel used including the tax, or 8¢ per
gallon less the tax f.o.b., Ingleside, the Humble

Honorable George H. Sheppard, page 2

Oil and Refining Company's refinery, 85 miles from the base of operation. Invoices of exemption were issued to Brown & Root by Humble covering the motor fuel involved.

"4. Brown & Root and their sub-contractors leased a large number of trucks in which the motor fuel involved was used. The trucks were leased from many different owners or lessors.

"5. An oral contract was entered into with each of the truck lessors in which Brown & Root agreed to pay lessors a fixed rental fee ranging from $1.75 to $2.50 per hour less the hourly wage paid the truck driver by Brown & Root and less the cost of the motor fuel. Brown & Root employed and paid the truck drivers and had full charge of the trucks and the operations in which the trucks were used. Brown & Root, in the agreement, adopted a fixed price of 17¢ per gallon as the cost of the motor fuel to be deducted from rental fee. The 17¢ price was determined, they contend, from their analysis and computation of handling costs, including cost of transportation from the refinery to Matagorda Island and the cost of distribution on the project.

"6. The motor fuel was supplied to each of the trucks by Brown & Root from their warehouse storage for which requisition tickets were issued showing the quantity in each delivery.

"7. When final settlement was made with each truck lessor, 17¢ per gallon for all of the motor fuel used in each such truck and the hourly wage paid the truck driver by Brown & Root was deducted from the hourly rental price agreed upon for each truck.

"Thus a legal question possibly arises as to whether or not the delivery of the motor fuel and

Honorable George H. Sheppard, page 3

the settlement therefor as described herein-
above constitutes a sale of the motor fuel to
the truck driver.  If a sale has been made, Sec-
tion 2 of the Motor Fuel Tax Law, Ch. 184, Art.
XVII, R.S., 47th Legislature, requires that the
tax shall be added to the selling price and
passed on to the purchaser.  Moreover, Section
13(a) of the Act provides that:  'Any person who
purchases motor fuel . . . for any purpose other
than in a motor vehicle operated . . . in whole
or in part upon any of the public highways,
roads and streets . . . upon which motor fuel
tax has been paid, either directly or indirect-
ly, shall be refunded the amount of such taxes
so paid. . . ."  Thus if a sale has transpired,
it appears that the purchaser and not the sell-
er, (or in this case re-seller) of the motor
fuel may be the only person who could file claim
for refund of the tax so paid.

"Brown & Root, Inc., has submitted a letter
containing factual statements and its views of
the legal emphasis to be given them.  We submit
it without concurring in the conclusions reached
and without comment as to the cost calculations
contained therein.  We also have in our files
the letter referred to by Brown & Root, which
was written by one of their accountants, H L
Westmoreland, in which the deliveries of motor
fuel made to the trucks by Brown & Root was re-
ferred to as 'purchases' of motor fuel from Brown
& Root.  But in this connection we are convinced
from our investigation that the motor fuel was
handled as explained in numbered paragraphs 1 to
7, herein, and the question as to whether such
deliveries were in fact 'purchases', is one to
be determined by the legal construction you place
on the transactions.

"Since Brown & Root placed their own drivers
in charge of the trucks which were used under
their own supervision and in the construction job

Honorable George H. Sheppard, page 4

being done by Brown & Root, the motor fuel was unquestionably used by Brown & Root.

"Section 13(d) of the Act, however, provides in substance that the Comptroller shall examine refund claims filed with him 'and if he finds that such claims are just, and that the taxes claimed have actually been paid by the claimant, then he shall issue warrant or warrants for the amounts due claimant.'

". . . ."

Your first question is:

"1. Did the supplying of the motor fuel by Brown & Root to the leased trucks under their control and the deduction of 17¢ per gallon for the motor fuel used therein from the rental fees paid by them to the truck lessors, under the conditions explained herein, constitute a sale or distribution of the motor fuel to the truck lessors? ('Sale' and 'distribution' are both defined in the Act)"

The complex and difficult question of what constitutes a sale of personal property always is faced with the greatest of reluctance. General definitions and principles governing a sale of personal property have been announced by the courts and have been variously stated by the text writers. For instance, 37 Tex. Jur., 69, Section 2, contains the following language:

"A 'sale' may be defined as a transfer of personal property from one person to another for a price in money or for property of an agreed money value. The Uniform Sales Act defines 'a sale of goods' as 'an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price.' The definition implies that there must be not only an 'agreement,' but also a present 'transfer' of property, or 'passage of title,' from seller to buyer. . . ."

Honorable George H. Sheppard, page 6

We feel, from the facts stated by you, that there was neither a delivery of possession of the motor fuel nor a passage of title thereto from Brown & Root to the truck lessors, and therefore no sale or distribution within the concept of the statute. The fact that Brown & Root paid some lesser amount for the fuel, yet adopted 17¢ a gallon as an agreed amount to be deducted from the rental fee under the contracts with the lessors of the trucks, is not material to this issue. The only sale or distribution apparent from your statement of facts is the transfer of title and possession from Humble to Brown & Root.

Your second question is:

"2. If no sale or distribution has been made to the truck lessor, then has Brown & Root paid the tax to the State in a manner that will entitle them to a refund under the provisions of the law, or was such tax ultimately paid by the lessor when the 17¢ was deducted from his rental fees?"

It necessarily follows, from our answer to your first question, that the tax was actually paid by Brown & Root, not by the truck lessors. The deduction of 17¢ a gallon from the rental fee does not mean that the lessors paid the tax.

Your third question is as follows:

"3. Since no other persons are claiming refund of the tax paid upon the motor fuel used in the transactions and under the conditions named hereinabove, can the Comptroller legally pay said refund to Brown & Root?"

Assuming, of course, that the claim for said refund was properly made, our answers to the first and second questions compel the conclusion that the Comptroller legally can pay the refund to Brown & Root, and to no one else.

Honorable George H. Sheppard, page 5

Benjamin on Sales, Second Edition, page 1, states the rule thus:

"A transfer by or under a contract of the property in goods for a price is called a sale."

In final analysis, each case must rest upon its own peculiar facts and circumstances to determine if, when and where a sale is consummated.

The problem is narrowed, somewhat, in the consideration of your first question by the fact that the Legislature has chosen to define a "first sale" as contemplated by the Motor Fuel Tax Law, thus superseding, insofar as inconsistent, the ordinary legal connotation of "sale." The definition contained in Acts 1941, 47th Legislature, page 269, Chapter 184, Article XVII, Section 1(m) (Article 7065b-1 (m) V.A.C.S.) is as follows:

"'First sale' shall mean the first sale or distribution in this State of motor fuel refined, blended, imported into, or in any other manner, produced in, acquired, or brought into this State."

In this connection it is material to note the definition of "distribution" as contained in subsection (h) of this same article:

"'Distribution' shall mean and include any transaction, other than a sale, in which ownership or title to motor fuel, or any derivative of crude oil or natural gas, passes from one person to another." (Emphasis ours)

While delivery of the subject matter is one of the principal factors determining the completion of any sale, as the term is ordinarily understood and defined, we think, from a consideration of the foregoing statutory provisions that actual delivery of the motor fuel to the purchaser in Texas constitutes and completes a taxable "first sale" or "distribution" and, in fact is indispensable to such first sale or distribution. See Opinion No. O-2488. Furthermore, to constitute either a "first sale" or a "distribution" within the scope of these definitions, there must be also a passage of the title thereto.

Honorable George H. Sheppard, page 7


- Trusting that the above and foregoing fully answers your inquiries, we are

Very truly yours

APPROVED MAY 24, 1945

ATTORNEY GENERAL OF TEXAS

ATTORNEY GENERAL OF TEXAS

By Arthur L. Moller
Arthur L. Moller
Assistant

ALM:db

